My name is Heather Geblin-Hacker and I represent the plaintiffs, OSU Students Alliance, and William Rogers in this matter. Before I begin, I would like to reserve three minutes of my time for rebuttal. Keep an eye on the clock. Yes, Your Honor. In the winter of 2009, the distribution bins for the alternative student newspaper at Oregon State University disappeared from the campus. They were recovered in a storage yard next to a dumpster. Ms. Hacker, I think we're generally familiar with the facts of this case. Let me ask you this. Where did Judge Aiken go wrong in saying that all the problems with the supposed unwritten policy, which is now, perhaps due to your efforts, written, it's all moot now, isn't it? I mean, you've got a policy that is in writing that gives you equal access for your publications at the university. What's left of this case? The issue of damages, Your Honor, both nominal and compensatory damages. The damages against the individuals, because you can't get damages against the state under the 11th Amendment, right? That's right. All right, so we're talking about past damages to your plaintiffs and your organization, and you'd like to get damages against the president of the university, Oregon State University, and the other persons who are lower on the organizational chart than he is, right? Now, point to me where the allegations of the complaint say anything about Mr. Ray taking any part in removal of the bins in which your Liberty magazine was offered to the public. Well, the violation was not simply due to the removal. It was also due to the existence of the policy which authorized the removal of the bins. And Mr. Ray, as well as the other named defendants, are policymakers at Oregon State University, and we've alleged in the complaint that all of the defendants are responsible for the policy at issue here. They've either created or implemented the policy. Moreover, all of the defendants, and this was made clear in the complaint, all of the defendants were aware of. There was no. Let me stop right there. You said they're all responsible for the policy, but initially, at least, the policy was an unwritten one, right? That's correct, Your Honor. At least that's what it seems like. Now, you know, what kind of allegation is there about who went to that, you know, who's responsible for that unwritten policy? I mean, in other words, I doubt that under Iqbal, you know, you can say, well, they're all responsible for the policy is good enough. Is it? Well, aside from the actual creation of the policy, all four defendants, and this was in the complaint, all four defendants were aware of the deprivation. They were aware that the bins were removed. Awareness is not enough for liability. Is it personal liability? Well, in terms of in terms of a constitutional violation, policymakers are liable, number one, for. So you're switching back for you said, well, they're aware. Not now. Now you're calling them policymakers. Is there an allegation as to who exactly created this unwritten policy anywhere in the complaint? Paragraphs 10 through 13 of the complaint do state that the name defendants created were responsible for the creation, implementation and enforcement of the policy at issue in the case. So Iqbal says mere conclusory allegations are not enough. There needs to be enough to rise to the level of plausibility. And Iqbal also says knowledge and acquiescence is not enough. And so we're looking really for something that goes beyond mere conclusory allegations that would be a factual allegation that would rise to make it plausible that these named officials were policymakers or implemented the policy or somehow get over that threshold. Can you help us with identifying what that language is? Yes. If I may grab. Three, three. As I mentioned previously, the there are the initial paragraphs 10 through 13 about each individual defendant. Additionally, there. Paragraph 13 only talks about this and Martirello. Yes. Paragraphs 10 through 13. Moreover, Vincent Martirello was involved in explaining what the policy was to the students. So presumably he had knowledge of the policy, was enforcing the policy. It was his department that took the bins and that wasn't disputed. That was in the complaint also. In addition, once the bins had been removed and the students asked why this had happened, every one of the main defendants was aware of the removal of the bins. And also, in addition to just being aware of it, they actually acquiesced in the continuing violation of the plaintiff's rights, in that the plaintiff's bins were kept off of campus pursuant to this unwritten policy. It ended up being almost a year that those bins were kept. So are you saying that knowledge and acquiescence, even after Iqbal, can be enough for this sort of constitutional allegation? Yes, Your Honor. I don't believe that Iqbal overruled any of the cases involving policymaker or supervisory liability, any of the cases that will hold an official responsible for condoning or acquiescing in a violation and ratifying a violation after it's occurred. Have you taken any discovery yet? No, Your Honor. In other words, you haven't had a chance to ask Mr. Martorella, for instance, well, how did you learn about the policy or questions like that? No, Your Honor. We have not been given that opportunity. Did you ask the district court for leave to amend? We did ask the district court for leave to amend in a Rule 59e motion, and that was summarily denied in an order, a one-sentence order on the docket. So this is my problem with that argument is the language in Iqbal where they're looking at respondents' arguments, and he says under a theory of supervisory liabilities, petitioner can be liable for knowledge and acquiescence in their subordinates' use of discriminatory criteria. We reject this argument, and then it goes on to explain why that sort of liability is not sufficient. What is your argument on that? Do you want to try and confine Iqbal to an allegation of discrimination, a discriminatory liability? Well, certainly this Court very recently suggested in Starr v. Baca, which the appellees filed a letter last week drawing the Court's attention to that case. Certainly in that case, the Ninth Circuit recently questioned the applicability of Iqbal to cases outside the context of cases naming a high-level executive official and involving the detainment of a suspected terrorist. So certainly, I mean, at least the Ninth Circuit recognized that in those cases there are particular motivations for requiring a little more factual allegation before a claim may lie against the Attorney General of the United States, for example. And in fact, the Ninth Circuit stated that, I mean, to back up a little bit, there is actually a circuit split on this issue as to whether or not Iqbal actually overruled the Swierkiewicz decision, which is just notice pleading. And the Ninth Circuit in Starr basically said that we're not going to answer that question yet, but what is clear is that the standard is that it has to be the allegations in the complaint have to give notice, fair notice to the other side, which is the Swierkiewicz standard, and also the allegations in the complaint must be plausibly suggestive of a claim such that it is not unfair to the other side to have to go through the discovery process. So in this case, there have been allegations sufficient enough to allow us to move on to the next stage, the discovery stage, and ask the particular questions. But at this point, it's clear that all of the defendants involved were policymakers. All of them were involved. Aside from the actual existence of the policy whenever it was created, they were aware that the students' rights were continuing to be violated pursuant to this policy. Pursuant to this policy, the students' newspaper distribution bins were relegated to a small area of campus. One area of campus was the only place that they were allowed to place outdoor newspaper bins, whereas the other publications on campus received more favorable treatment. In addition, because the policy is unwritten, that's unconstitutional in and of itself because it was standardless, and the policy is an unconstitutional prior restraint. If you had been given leave to amend, would you be able to include allegations that were more specific than factual, or would you not be able to based on what you have, the knowledge you have right now? Well, after the complaint was filed, there certainly have been changes that have taken place. You know, the university changed their policy after we filed a motion for preliminary injunction, so that would be taken into account. And we do have some additional information, but, again, it's difficult for us to be able to – if we're required to plead a claim with such factual specificity when all of the information that we would have to plead is in the sole control of the defendants, it makes it very difficult to be able to state a claim. I want to take Martorello's deposition and ask him, where did you get the notion that there was an unwritten policy? Who told you? Who changed it now? That's the sort of question you'd like to ask him, right? Yes. Yes, Your Honor. And, you know, the general counsel of the university actually did admit that it was an unwritten policy, and it's clear that the way Martorello applied it, that it was standardless, and that's all outlined in the complaint. I see that I'm getting close. Yes. Thank you, Your Honor. May it please the Court. My name is Carla Farrell. I represent the defendants Ray, Martorello, McCambridge, and Roper. I want to talk about the three elements that are necessary for making a 1983 claim, and the two parts that are missing here are the, excuse me, action by defendants and causation. There's no link between, particularly as to Ray, McCambridge, and Roper. I'm going to split them up into groups, because all we've got with regard to those three is that they were generally in their positions. They were generally responsible. What do you think somebody in the position of the OASU student alliance should do? As Zachary said, you're talking about information within the sole control of the defendants, right? Are they supposed to know what to plead with more specificity? Well, excuse me, I don't – that's a difficult question to answer. That's an investigation matter. It sure is. But the point here is whether the complaint we have in front of us is sufficient. And with regard to the three administrators, there's no connection. You say yourself, this is what you say about Starr. The allegations in the complaint must be specific, sufficiently detailed to give fair notice to the opposing party. The nature of the claim. Well, I assume you know that the nature of the claim. And second, you say the allegations must be sufficiently plausible that it's not unfair to require the opposing party to be subjected to discovery.  It's not clear that the defendant is the one who made the unwritten policy. It seems to me this complaint meets that test. Well, there isn't any connection between the three defendants I mentioned and the constitutional violation. First of all, I don't concede. Is it your position that only one person made the unwritten policy and that was Wray? That's not my position. What is your position as to who made the unwritten policy? My position is the complaint doesn't say who made the unwritten policy. But you would concede that the unwritten policy is made by one of the four or all four of the defendants, or would you not? No, I wouldn't concede. It was made by some god in Olympus? I don't know where it came from because we're going by what the complaint says. Then shouldn't the plaintiffs be available, shouldn't they have the opportunity to take the deposition of everybody from the top down and say who made the policy? Well, perhaps had they made a sufficient allegation, yes. But they didn't here. Well, they say the duties at paragraph 10 through 13, they say the duties regarding this policy are of these four defendants, right? That's what they say. So they've got to take a deposition. I don't know. I haven't done this in quite a while, but I don't know whether you start from the bottom up or from the top down. I imagine if you start from the bottom up, everybody points up, says, no, not me, I didn't do that policy, he did. And then the next guy says, well, no, I didn't do the policy, he did. And sooner or later, the buck stops with Mr. Wray, right? And if he says, I don't know who made the policy, what about that? That's a possibility, isn't it? It is a possibility because we have very little allegation here as to what happened. We don't know who created the policy. And as to those three, all we've got is a general supervisory allegation. I think a jury would like to hear that all these people are pointing the fingers at each other. Well, I'm not sure that would happen. I mean, that's a lot of speculation about who would point to who. It may be that it was Mr. Martorello, as the facilities person, who decided that these bins were in his way. But moving away from just the creation of the policy, opposing counsel is also arguing the maintenance of the policy. And the complaint does allege that all of the defendants were informed about this issue. There was a proposed alternative policy that was then rejected and confirmation. We've determined through their attorney, we've determined that this policy is content neutral. And so there are more allegations relating to maintaining the policy after they've been alerted. Why isn't that enough in the complaint? Well, if you look at the complaint in detail, and the plaintiffs are relying quite a bit on the e-mails that they received from various people, none of those e-mails from any of the three defendants other than Martorello suggest that they knew anything about different treatment for the barometer. And that's the key piece here that defendants, plaintiffs need to create a claim here. As an equal protection claim, but not as to the First Amendment claim or as to the due process claim. Well, if it's the First Amendment claim, the difference between treatment is what they rely on for the First Amendment claim, because otherwise it would be content neutral. That's where the content neutral piece comes from in their argument. They say it's not content neutral because the barometer was treated differently. If that piece is not there, this is clearly a content neutral policy, and there's no evidence. Here's the problem, Ms. Rowe, you see. I don't think it's disputed that there's, you know, everybody agrees, at least at the start, there was some kind of unwritten policy. Nobody seems to know or to admit exactly what the policy said, including what the standards are, who had the authority, you know, to make the standards, to vary the standards, to apply the standards. That's where it starts. And then we and then we get to the implementation. And then all the allegations about, well, you know, the this paper was restricted to a certain few locations. The other paper got to put their papers in other locations and so forth. Now, according to you, the complaint is deficient because the plaintiffs don't say, well, you know, they don't allege causation. Right. You know who did what. But how are they supposed to learn that? How are they supposed to know that when even you, you know, take the position that, well, you're not fessing up. You know, you're not. Can you tell us who wrote the policy right now? Do you know? No, I don't. You think it's possible that nobody knows within the university? No, I don't think that's possible. You think somebody knows? Yes. Who is that? I don't know. Because if you don't know, how are they supposed to know? Because I'm not the I'm not the university's attorney with regard to the initial appeal. I'm talking about my question is whether it's how is how is a plaintiff? It's pretty clear to me, you know, their rights were infringed. But how is the plaintiff in that position supposed to learn enough as to who is responsible in order to make a plausible allegation? That's the dilemma. Isn't that the place? How would you suggest they go about it? Well, they could have given a little advice. They could have said Martorello created the policy and and and was motivated in good faith under Rule 11. Excuse me. Can they do that in good faith under Rule 11? I'm I'm not sure. You're not sure. But you're still telling them they should do that, even though they have no basis for doing it. I am here as an appellate attorney. I don't do trial work. I understand that. And so I can't give you the answer exactly as to what the plaintiff should have done. What I can say is that this complaint is insufficient because none of the three, Martorello excuse me, Ray, McCambridge or Roper knew that the barometer was being given preferential treatment. Without that piece, there isn't any problem with this. No, no, no, no. Suppose the allegation is that the content of Liberty magazine is not sufficiently politically correct for OSU. Allegation as to that. Well, their allegation is that their format or their thinking is quite different from that of the barometer. That's their allegation. So that proof would be admissible to show the difference is the barometer is politically correct and Liberty is not politically correct. That would be admissible, relevant evidence to prove the difference. It would also be relevant to show that the Eugene Weekly was treated the same way and it's extremely liberal. And there, you know. It would go to the equal protection claim, but it would not go to the content regulation claim. Yes, but every all the allegations show and all the communications from any of the defendants show that they were concerned about the bins being on campus. There is no allegation that there was any motive with regard to content. Well, we know that the bins being tied by bicycle chains to at least one post was also done by the barometer. And Mr. Martorello did not raise the issue of possible ADA noncompliance. There are some allegations somewhere in one of the emails. I couldn't tell you which one. But let me let me explain one other distinction. The ADA was OK as to the barometer, but the ADA was violated by the Liberty's chains, bicycle chains similar to posts, right? The difference is that the bins. You get a little bit of a feeling that maybe they're using different rules as to one or the other. I do not because the distinction is that the barometer is an OSU paper and the bins are OSU property. The bins are OSU property. One of the one of the questions that was raised was by one of the people who was that they had better means of communication with the barometer. Yes. Right. The barometer offices on campus. Better means of communication. Does that mean better means of control? No. I mean, it's communication. What does that mean? Because the Liberty didn't have a telephone. No, because the barometer is on campus. The barometer is the bins are OSU property. The facilities people know who to find when there's a problem. And the barometer is a daily paper. There was daily attendance to those bins by barometer staff. The Liberty, by contrast, is monthly. And there's some indication that they didn't have a month. Doesn't it have a masthead with the name of the editor and the phone number? There is a masthead in the paper. Yes. So you can't call that phone number? You probably could, but there's no guarantee you're going to find them or how they are. Did they try to find it? I don't I don't know. The problem is that this is a bin policy. They can control and move and unchain any barometer bin because it's OSU property. They can't do the same with the bins of other organizations whom they don't have a daily working relationship on campus. Unless they make them, you know, unless they make the other organization give them a key. Right. Well, that could be. You could do that. I mean, that's you know, that's a lesser restriction than tearing out the bin and throwing it in the trash dump. Well, they were made available and they were returned to the plan after a complaint. After a complaint. And that's when they knew that they were that there was a problem. But at that point, there was the only thing they knew is they were in the way. Apparently they hadn't been attended to because plaintiffs didn't discover the thing they were missing. That's not the only thing they knew. They knew there was a newspaper inside. They knew if they opened up the newspaper, there's, you know, the name of an editor at the newspaper. They knew they could contact somebody. Right. You see, the only thing they knew was there was a bin that was chained to a post. It depends on who we're talking about. Talking about, you know, a custodian. OK. The scooter down the campus. The custodian is not a named defendant. First of all. Second of all, it's there's no allegation that any of these people knew any of that. That had any. Common sense. Excuse me. We're just talking about common sense. What you said was the only thing they knew there was a bin chained to a post. That's not all. I mean, you know, there are a lot of things that are ordinary knowledge. Right. That's not all. They knew that there was a bin chained to a post. They knew that inside inside the bin was a newspaper called the Liberty. Right. Well, that's not we don't even know that any of the bins but one had any papers in them. Apparently they hadn't discovered that they were. What do you mean? There are 150 copies in the dump in one bin. Yes. They knew that looks to me from the picture that it's not the it's I'll drop that piece. But we don't know that the bins had any papers in them other than one. The copies were ruined. We do know that they don't know when the bins disappeared and they didn't discover that they had disappeared until April. We don't. It could have been a couple of months before they realized they were going as far as we know. A slightly different question that the judge dismissed with prejudice. And we said leave to a man should be granted with extreme liberality. Why wasn't that an error on the part of the judge? What she didn't give any explanation. So we don't know what her views were. No. And it's a you know, it's a matter of the court's discretion. There is nothing one way or the other with regard to the complaint to the judgment. And it's true that the plaintiffs did file. I think it's 59 e motion. But that that was a reconsideration of the judgment, not a motion to amend the complaint. It said at the very least the judgment should be should be should allow motion and should allow leave to amend. But did not specifically ask for leave to amend. And in none of the pleadings did they ever suggest what they would do differently to plead a complaint that would survive my motion to dismiss under 12b-6. So that's I'm going to rely basically on futility. I think it was clear to the to Judge Aiken that there wasn't anything that they could do with regard to pleading this case. So I'm going to rely on futility.  And I'm going to rely on the defendant's defense against these defendants for the removal of their bins and two months worth of only two bins rather than seven on campus. Wait a minute. You've taken the position that you don't really know who promulgated this unwritten rule. I don't. And you're saying it's not alleged. That's right. We review the refusal to grant leave to amend de novo. And we have very liberal standards on that. I'm going to rely on futility. And I'm going to rely on the defendant's defense against these defendants for the removal of their bins. And I'm going to rely on the defendant's defense against these defendants for the removal of their bins. If they all go to the depositions of the people that they take and find out who wrote that policy, then they will be able to allege it and amend the complaint. Isn't that the solution here? If they all say nobody did the policy and point the finger at everybody else, that's a position they might take. But we can't find out unless the depositions are taken. I think that the other issue is regardless of who did what, we don't have an allegation of First Amendment violation. In my view, I haven't had a chance to explain that, and my time is up. So I'll sit down, but I want to make sure that I have said that. Thank you very much. Thank you very much. You have three minutes, Mrs. Hacker. Your Honors, there were just a lot of facts that were mentioned that were nowhere in the complaint. And so I just wanted to make reference to that at the outset. There's no evidence in the complaint or even that I'm aware of that the barometers bins were OSU property. I've heard that for the first time today. But it's telling that the appellees have relied upon information that's outside of the complaint in order to defend themselves here today, yet they point to the complaint and saying that they don't even know who created the policy. Well, I think in fairness, maybe she was driven to that by some of the questions asked by the panel. But she is correct that, you know, it's pretty hard to draw the causation inference with respect to these individual defendants from the complaint, that they caused the two, three separate violations that you claim. They meaning, you know, individual defendants by their acts. Well, it is clear that they caused the violation in that they were all in communication with the students during the period of time that the students were not allowed to have any bins on campus outside of the immediate area of the Memorial Union. When the students were begging for their bins to be replaced back on campus, when the students were creating draft policies and trying to submit them to the administration, all of the four named defendants were in communication with those students. They were all aware that the students' bins had been excluded from campus for that period of time, yet they continued to defend not only the continued exclusion of the bins, but the initial removal of the bins. They continued to go back to their policy. They defended their policy as constitutional. They never suggested anywhere that anything that was done was contrary to their policy. Well, what about opposing counsel's point that there was no allegation that those officials knew that the Liberty and the Daily Barometer were being treated differently, which is the linchpin of the First Amendment claim? Well, Your Honor, that I would respectfully disagree because that is not the linchpin of the First Amendment claim. Certainly, disparate treatment is relevant for a claim of viewpoint discrimination and is relevant to a claim of equal protection violation. However, there is a very clear First Amendment violation here in the fact that this was an unwritten standard policy that granted unfettered discretion to these administrators, which is made clear on the face of the complaint in the way that it was applied. Of course, we don't know who promulgated that policy, which of these, if any of these defendants were responsible for that, right? We don't know that, according to the allegations of the complaint. Well, we did allege that all four defendants were responsible for that policy. And, you know, one thing, yes, yes, there do have to be specific facts alleged in a complaint. However, the Court is allowed to make reasonable inferences from the facts alleged. And it's certainly, at minimum, a reasonable inference to make that the head of the Facilities Department, Vincent Martorello, who was in charge of the people who removed the bins, it's certainly a reasonable inference to make that he would have had something to do with the policy that the bins were removed. Because, see, this is not just a case of mere acquiescence in some kind of a rogue action by an individual government official here. This was not an action of a rogue groundskeeper that just decided one day to go and remove all of these bins. Those bins were removed pursuant to official OSU policy, an unwritten policy, but, yes, an official policy that they have repeatedly stated that was their policy and that they continue to defend as their policy. So this is not just simply a situation of mere acquiescence. All of these ---- Are you asking for attorney's fees in this case? Yes, Your Honor. Yes, we are, Your Honor. I'm sorry. I suppose that's another issue. But going back to the issue of the First Amendment violation here, that's clear on the face of the complaint that this policy gave unfettered discretion to all of these officials. And we detailed in the briefs how it violates the First Amendment in other ways. You're a minute over. Thank you very much. Excuse me. Thank you. The case of Oregon State University Student Alliance v. Ed Ray et al. is submitted. Thank you very much for your argument.
judges: Tashima, Bea, Ikuta